UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CURTIS L. WESTBROOK, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:16-cv-02913-TWP-DML ) |
| BRIDGES COMMUNITY SERVICES, | ) ) |
| Defendant. | ) ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Bridges Community Services ("Bridges") ([Filing No. 69](#)). *Pro se* plaintiff Curtis L. Westbrook ("Westbrook") filed this lawsuit against Bridges, alleging claims for gender and disability discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 701, as well as a claim for breach of contract. After answering the Complaint and denying liability, Bridges filed its Motion for Summary Judgment, asserting that Westbrook was not its employee, and it is not subject to the federal statutes upon which Westbrook's claims are predicated. For the following reasons, the Court **grants** Bridges' Motion for Summary Judgment.

**I.   BACKGROUND**

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Westbrook as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Bridges is a 501(c)(3) non-profit organization located in Muncie, Indiana. Its focus is on providing services to homeless and low-income individuals. Bridges was a sub-grantee agency of Senior Service America, Inc. ("Senior Service"), a federal grant program which administers the Senior Community Service Employment Program ("SCSEP"). The SCSEP grant is funded by the United States Department of Labor as authorized by Title V of the Older Americans Act, 42 U.S.C. § 3056. The purpose of SCSEP is to foster economic self-sufficiency and promote useful part-time opportunities in community service assignments for unemployed, low-income individuals who are 55 years of age or older. The program specifically focuses on individuals who have poor employment prospects in order to increase the number of older individuals who would enjoy the benefits of unsubsidized employment ([Filing No. 71-1 at 2](Filing No. 71-1 at 2); [Filing No. 71-2 at 2](Filing No. 71-2 at 2)–3).

SCSEP provides grants to subsidize low-income seniors in job training and assistance to help them transition into unsubsidized employment in the public or private sectors. Senior Service administers SCSEP grant funds by contracting with and funding a network of local non-profit entities, and these sub-grantees provide SCSEP participants with opportunities through part-time assignments for training, funded by the SCSEP grant, in a wide variety of community service work activities at non-profit and public facilities. The community agencies where SCSEP participants are placed for work assignments are referred to as "host agencies." ([Filing No. 71-2 at 3](Filing No. 71-2 at 3).)

Bridges was a sub-grantee and part of the Senior Service network when Westbrook participated in the SCSEP program. Bridges administered SCSEP as a sub-grantee agency in the Muncie area pursuant to its contract with Senior Service. Sub-grantee agencies pay SCSEP participants with SCSEP funds and withhold their taxes. Participants work an average of twenty hours per week at their host agency, and they are limited to spending a maximum of forty-eight

months in the program under the SCSEP individual durational limit. Participation and re-enrollment in the SCSEP program are discretionary ([Filing No. 71-2 at 3](Filing No. 71-2 at 3)–4).

Sonya Weatherspoon ("Weatherspoon") was employed by Bridges as the program director of SCSEP from 2013 to 2017. She accepted applications from individuals who were interested in participating in SCSEP, assisted participants with creating individual employment plans ("IEP"), and worked with participants to find placements at a host agency that fit their IEP, skill set, and education. After participants were placed with a host agency, the host agency supervised the participants, set the participants' job duties and specific work hours, and provided them with the tools and equipment to complete their tasks. Bridges did not consider the SCSEP participants to be employees of Bridges, and Bridges did not supervise, control, or direct their work tasks or responsibilities at the host agencies. Bridges simply facilitated placement with host agencies and receipt of paychecks through the SCSEP program grant funds ([Filing No. 71-2 at 2](Filing No. 71-2 at 2), 4; [Filing No. 71-1 at 3](Filing No. 71-1 at 3)).

Westbrook applied for the SCSEP program by walking into the Bridges office, filling out an application, and providing the requested information. Westbrook believes that his registration and application for SCSEP occurred in April 2014, and Bridges' records suggest his application was submitted in May 2014. Following his application, Westbrook first interviewed for placement at a host agency in October 2014. He interviewed with Attic Window, which is a resale facility that sells used clothing and household items. During the interview with Attic Window, Westbrook informed the interviewer that he had a bachelor's degree, and the interview abruptly ended because he was overqualified for the position. Westbrook had another interview with a host agency in October 2014, this time with Habitat Restore, another second-hand store. He was selected for a position at Habitat Restore as a receiving clerk/delivery clerk/pick-up clerk. Westbrook's

assignment with Habitat Restore was scheduled for October 21, 2014 through June 10, 2015. His responsibilities included receiving and picking up items that people donated to Habitat Restore (Filing No. 71-3 at 7–8; Filing No. 71-2 at 5).

While working at Habitat Restore, Westbrook either drove himself to the store or took a bus. He was supervised by "John". Bridges did not direct Westbrook's work at Habitat Restore, and Habitat Restore set the specific hours for his work (Filing No. 71-3 at 13). Habitat Restore was the only host agency to which Westbrook was assigned during his time in the SCSEP program with Bridges . *Id.* at 9. Westbrook never performed any work for Bridges at the Bridges office. *Id.* at 13.

From January 27, 2015 through February 9, 2015, Westbrook was off work from Habitat Restore because of a surgery. He was medically released to return to work on February 10, 2015, with a "no heavy lifting" restriction until March 10, 2015, after which he could perform his regular duties without any restrictions. During the time Westbrook had the lifting restriction, he was unable to work at Habitat Restore because they could not use him. He eventually worked off and on at Habitat Restore but then decided he was not going back because of physical challenges. He asked Weatherspoon to be reassigned to a different host agency. At that time, Westbrook agreed to return to Habitat Restore to see if he could handle the work or until Weatherspoon found something else for him. When he returned, he realized he could not do the work because of problems with his shoulders and knees. Westbrook informed Weatherspoon that he could not do the work (Filing No. 71-3 at 9–10; Filing No. 71-2 at 5–6, 12).

Weatherspoon arranged an interview for Westbrook on March 3, 2015, with Work One Center. He felt the interview went well, but he was not offered a position because Work One did not have enough work for him in the resource area (Filing No. 71-2 at 7).

On March 16, 2015, Weatherspoon spoke with personnel at the City of Muncie to determine if Westbrook could be placed there, but Weatherspoon was informed that Westbrook was not allowed on the City's premises. Westbrook asked multiple times to be assigned to the Unity Center, a non-profit agency in Muncie, which would require Westbrook to cover "open gym" time for children. However, at the time, the Unity Center was not an approved host agency because it did not have a director, and Weatherspoon was concerned that Westbrook would not have appropriate supervision. Weatherspoon also believed that Westbrook's degree and employment goals did not fit with the open gym position ([Filing No. 71-2 at 6](Filing No. 71-2 at 6)–8).

On April 1, 2015, Westbrook was scheduled to attend an interview with the Boys and Girls Club for the position of project and facility assistant. He did not attend the scheduled interview, but he did interview a few days later. Bridges was not notified that Westbrook had interviewed. Westbrook was not offered the position but was informed that there were other positions coming available. The Boys and Girls Club interviewer told Westbrook that he would follow up with him, but that did not happen ([Filing No. 71-2 at 8](Filing No. 71-2 at 8); [Filing No. 71-3 at 11](Filing No. 71-3 at 11)).

On April 14, 2015, Westbrook went to work at Habitat Restore. He had been late to work on the days leading up to April 16, 2015, so Kirk Miller with Habitat Restore contacted Bridges to inform them of Westbrook's attendance problems. Mr. Miller told Westbrook that, if he continued reporting late, he would be asked to be transferred to a different assignment. Westbrook accepted and agreed to correct his behavior. His last day at Habitat Restore was April 17, 2015 ([Filing No. 71-2 at 8](Filing No. 71-2 at 8), 13, 19).

On April 17, 2015, Westbrook attended a meeting with Bridges at the Work One Center. Westbrook recalled possibly having a re-determination meeting during this meeting to determine if he would be eligible to continue in the SCSEP program. The meeting was for Bridges'

employees and participants. The participants were informed, "These are not jobs. These are assignments, and you are only supposed to be in the program for two years. And there are some people that haven't gotten a job yet. So we are going to take them off the program." ([Filing No. 71-3 at 12](#).) Bridges asked Westbrook to apply for the AIM program on April 29, 2015, but Westbrook responded that he was unable to do so because he previously had been terminated from that program ([Filing No. 71-2 at 8](#); [Filing No. 71-3 at 12](#)). Weatherspoon attempted to contact Westbrook on April 29, May 6, May 7, and May 8, 2015, regarding reporting to work and his continued interest in the SCSEP program. However, Weatherspoon did not hear back from him. Westbrook never received these telephone calls or messages ([Filing No. 71-2 at 8](#)–9).

On May 12, 2015, Weatherspoon sent a letter to Westbrook, stating that his last day with the SCSEP program would be May 12, 2015 because he exceeded the sponsor leave without pay/approved break policy by failing to accept or transfer to a different community assignment at the Boys and Girls Club by the required date without due notice or good cause. Westbrook did not learn of his termination from the SCSEP program until October 2015 ([Filing No. 71-2 at 9](#), 14; [Filing No. 71-3 at 12](#)).

On October 26, 2016, Westbrook initiated this lawsuit by filing a *pro se* Complaint. Then on January 8, 2018, Westbrook filed the operative Amended Complaint, asserting claims against Bridges for employment discrimination based on gender pursuant to Title VII and based on disability pursuant to the ADA and the Rehabilitation Act, as well as a claim for breach of contract ([Filing No. 56](#)).

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Westbrook, as the non-moving party and draws all reasonable inferences in his favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

The Court notes that "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

> However, it is also well established that pro se litigants are not excused from compliance with procedural rules. [T]he Supreme Court has never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.] Further, as the Supreme Court has noted, in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009) (citations and quotation marks omitted).

### III. DISCUSSION

Westbrook argues that Bridges discriminated against him based on his disability and gender when it placed females into work assignments more quickly than males, it placed females into less physically demanding assignments, it failed to place him into an assignment with the Unity Center, and it terminated his participation in the SCSEP program.[1] Westbrook also argues

---

[1] On his fill-in-the-blank "Employment Discrimination Complaint," Westbrook checked the box for a claim brought pursuant to the "Equal rights under law (42 U.S.C. § 1981)." (Filing No. 56 at 2.) However, Westbrook acknowledged

8

that he had an employment contract with Bridges, and Bridges breached that contract when it did not allow him to continue working for the full four-year period in the SCSEP program.

Bridges argues that Westbrook's claims for employment discrimination must fail as a matter of law because participants in the SCSEP program are not "employees" of the program grantees and sub-grantees, and Bridges had less than fifteen employees, and thus, the federal statutes upon which Westbrook relies do not apply to Bridges. In any event, Bridges asserts, there is no evidence to support a gender or disability discrimination claim against Bridges for any of its conduct as it relates to Westbrook. Bridges further argues that there was no employment contract between it and Westbrook to support a claim for breach of contract.

While the parties asserted various arguments and pointed out numerous facts, the Court focuses its discussion on the outcome-determinative issues only. First, concerning the "employment status" of SCSEP participants: when establishing the SCSEP, Congress declared that the program was created:

> To foster individual economic self-sufficiency and promote useful opportunities in community service activities (which shall include community service employment) for unemployed low-income persons who are age 55 or older, particularly persons who have poor employment prospects, and to increase the number of persons who may enjoy the benefits of unsubsidized employment in both the public and private sectors.

42 U.S.C. § 3056(a)(1). The statute further explains that grant funds made available through the SCSEP will pay for "participant" wages, "participant" training, and job placement assistance among other things. 42 U.S.C. § 3056(c)(6).

The statute explicitly states that "[e]ligible individuals who are participants in any project funded under this subchapter shall not be considered to be Federal employees as a result of such

---

in his response brief, "The Defendant is correct, the *pro se* Plaintiff is not bringing a claim for race discrimination under 42 U.S.C. 1981." (Filing No. 94 at 57.)

9

participation." 42 U.S.C. § 3056b(a). As another district court in this Circuit has explained, the "legislative history indicates that SCSEP participants are not to be considered employees of grantees and national sponsors." *Henderson v. YMCA*, 2006 U.S. Dist. LEXIS 24387, at *5 (C.D. Ill. Mar. 20, 2006). Quoting the legislative history, the district court noted, "The Committee reaffirms that participants in the Senior Community Service Employment Program are enrollees in a work and training experience program. They are not employees of the Department of Labor or State and national sponsors administering the SCSEP." *Id.* at *6.

The Court concludes that Westbrook was not an employee of Bridges (an SCSEP sub-grantee) under the SCSEP program in light of the language in the statute itself and the legislative history highlighted in the *Henderson* decision. The statute described individuals in Westbrook's position as "participants" and allowed for payment of wages and training to participants in order to help them find job placement and increase their chances to secure unsubsidized employment in both the public and private sectors.

In this case, Bridges acted as a facilitator to connect Westbrook with part-time, temporary work assignments that would provide him with training experience and federally-subsidized funds. Westbrook's participation in the SCSEP program was intended to prepare him for and lead him to permanent employment with an employer.

Moreover, the designated evidence shows Bridges did not have more than fifteen employees at the times relevant to this case, and thus, Bridges cannot be considered an "employer" under Title VII or the ADA. Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). Similarly, the ADA defines an employer as "a person engaged in an industry affecting commerce who has

10

15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A).

Bridges submitted admissible evidence to show that it had no more than thirteen full-time and part-time employees in total during 2014 and 2015 ([Filing No. 71-1 at 2](Filing No. 71-1 at 2)–3). In attempting to refute this evidence, Westbrook points to a printout from Bridges' website from 2013 that shows twelve staff members, and he handwrites on the printout, "+ 4 additional BCS employees conveniently omitted!" ([Filing No. 94-1 at 42](Filing No. 94-1 at 42).) However, Westbrook's evidence shows only twelve employees, and his handwritten comment is non-specific, non-authenticated, and speculative. "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion," *Dorsey*, 507 F.3d at 627, and the non-moving party cannot meet their "burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink*, 900 F. Supp. at 1072. Because the relevant, admissible designated evidence shows Bridges had no more than thirteen employees during 2014 and 2015, Bridges does not qualify as an "employer" under Title VII or the ADA. Westbrook's Title VII and ADA claims fail as a matter of law because he was not an employee of Bridges and Bridges was not his employer.

On his fill-in-the-blank "Employment Discrimination Complaint," Westbrook also checked the box for a claim brought pursuant to "The Rehabilitation Act (29 U.S.C. § 701, *et seq.*)." ([Filing No. 56 at 2](Filing No. 56 at 2).) The Rehabilitation Act explicitly states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.)" 29 U.S.C. § 794(d). Because the Rehabilitation Act uses the ADA's standards for determining whether the Act has been violated, and because the

Court has determined that the ADA claim cannot survive as a matter of law, the Court concludes that Westbrook's similar Rehabilitation Act claim likewise must be dismissed as a matter of law.

Turning to Westbrook's breach of employment contract claim, the Court reiterates that no employee/employer relationship was formed between Westbrook and Bridges. Westbrook asserts that a contract was formed and then breached when Bridges did not allow him to participate in the SCSEP program for the full four years. However, Westbrook failed to designate any evidence to show the existence of an employment contract, and the evidence he uses to assert entitlement to a full four years of participation in the SCSEP program simply notes that the statute limits participation to a maximum of four years ([Filing No. 94-1 at 2](Filing No. 94-1 at 2)). The statute authorizing the creation of the SCSEP program allows participants a maximum of four years in the program. This does not provide a contractual right or a guarantee to program participants to four years of participation in the program. Westbrook's breach of contract claim is not supported by evidence and also fails as a matter of law.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Bridges Community Services' Motion for Summary Judgment ([Filing No. 69](Filing No. 69)) is **GRANTED**, and Plaintiff Curtis L. Westbrook's claims are **dismissed**. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 9/19/2019

*[signature]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Curtis L. Westbrook
1113 East 6th Street
Muncie, Indiana  47302

Samuel J Beasley
DENNIS WENGER & ABRELL
beasleys@dwapc.com

Theodore J. Blanford
HUME SMITH GEDDES GREEN & SIMMONS
tblanford@humesmith.com

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com